# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 17, 2014 Session

## STATE OF TENNESSEE v. JOSEPH ANTHONY SAITTA, JR.

### Direct Appeal from the Circuit Court for Warren County
### No. F-13783     Larry B. Stanley, Jr., Judge

### No. M2013-01947-CCA-R3-CD   Filed September 5, 2014

A Warren County Circuit Court Jury convicted the appellant, Joseph Anthony Saitta, Jr., of rape of a child, and the trial court sentenced him to fifty-eight years in confinement to be served at 100%.  On appeal, the appellant claims that the trial court erred by denying his motion to suppress evidence when an investigator from the Our Kids Center had been improperly informed that the appellant had a prior juvenile adjudication for a sexual offense and that the evidence is insufficient to support the conviction.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE, J., and LARRY J. WALLACE, Sp.J., joined.

Joshua T. Crain, Murfreesboro, Tennessee, for the appellant, Joseph Anthony Saitta, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In July 2012, the Warren County Grand Jury indicted the appellant for rape of a child. The alleged victim was his daughter, who was born on June 30, 2009.

At trial, Sethly Hodges testified that she became a licensed practical nurse in November 2010, began working for CareAll Home Health in April 2011, and was assigned

to care for the victim from April to November 2011. The victim, who was two years old in November 2011, was Hodges's only patient. The victim suffered from cerebral palsy, brain damage, scoliosis, and breathing problems; had a feeding tube and tracheostomy; and could not speak. Hodges did not think the victim had clear vision, but the victim could hear. Hodges said that she and another nurse "split" the victim's care, each working twelve-hour shifts, and that she cared for the victim thirty-six to forty-six hours per week. The nurses looked after the victim in her home and "did everything" for her, including changing her diaper, sometimes washing her laundry, bathing her, flushing her feeding tube, and giving her breathing treatments. Usually, one of the victim's parents was present. Hodges said she never had to leave the victim alone with the victim's parents because another nurse always came in at the end of Hodges's shift and "relieved" her.

Hodges testified that at some point, the victim's family lost use of both of its vehicles. The nurses tried to help the family by driving the appellant to work, and Hodges even let the family use her car to run errands. The victim's mother also had a five- or six-year-old son, but he did not live with the family. In November 2011, the victim's mother was scheduled to have visitation with her son for Thanksgiving. The victim's mother did not have transportation, so Hodges drove her to pick up the boy on Tuesday, November 22, 2011. The trip lasted about four hours. While Hodges and the victim's mother were gone, the victim was at home alone with the appellant. Hodges said she was not worried about leaving the victim with the appellant because the victim's mother was not concerned about it. Also, the victim had been left alone with the appellant previously, and the appellant knew how to take care of her. Before Hodges and the victim's mother left for the trip, Hodges checked the victim's diaper and flushed her "trach." The diaper did not need to be changed.

Hodges testified that while they were on the trip, the victim's mother received a text from the appellant, stating that the victim had had "a really big, hard bowel movement and he didn't think the nurses were giving her enough water that he was going to give her water." Hodges stated that she had never experienced the victim "being what I would call constipated. There maybe [had] been a day or two that she didn't have a bowel movement but that doesn't necessarily mean that she was constipated." Hodges said that the victim sometimes received Miralax or Benefiber in her feeding tube and that the victim's mother "would kind of switch her back and forth, Benefiber and Miralax and there was discussion that she may have been constipated but as far as when I was there I never saw any -- nothing concerned me as far as constipation." Hodges had never seen blood in the victim's stool.

Hodges testified that when she and the victim's mother returned home about 4:30 p.m., she went into the victim's bedroom and immediately smelled the strong odor of a bowel movement. The appellant was lying on the floor in the room but got up and went into the living room, and Hodges began changing the victim's diaper. She said that when she opened

it, she noticed blood and "a little bit of discoloration as far as like a little bit of brown but it's not what I would call a bowel movement." Hodges said that she had been expecting a bowel movement in the diaper but that "[t]here was what appeared to be like BM, maybe almost looked like a little bit of diarrhea maybe. . . . [A]nd then there is like slimy stuff. It's all kind of mixed together." Upon seeing the blood, Hodges called for the victim's mother. When the victim's mother came into the room, she inspected the victim's rectum, and they saw that the victim's rectum had been "ripped." Hodges said that the rip was not "front to back" but that it was "a good size rip" and "shocking." Hodges wiped the victim's vagina with a baby wipe but saw no blood. When she wiped the victim's rectum, blood was on the wipe. She stated,

> I'm not going to say that it was oozing out but again, whenever she pulled her bottom apart you could see blood up inside of there kind of with the bodily fluids, there was tissue. I didn't just sit there and stare at it because it was very gut wrenching.

Hodges testified that the victim's mother's face "got red," that both of them were shaking, and that the victim's mother began yelling at the appellant. The victim's mother went to speak with him, and Hodges could hear them "bickering back and forth." The victim's mother wanted to know about the blood and "how did your daughter's bottom get like this." The appellant said he did not know.

Hodges testified that she was panicked, scared, and "thinking the worst." She stated, "I couldn't even, like as a nurse, looking back, I should have looked further at [the victim] but I have a two year old daughter and seeing that was very traumatic." Hodges wanted to telephone her supervisor but was afraid the appellant would hear her and was afraid of what the appellant might do. Therefore, she texted her supervisor about the situation. When her supervisor did not respond, Hodges texted Tracy Martin, the nurse who was supposed to relieve her from her shift. Martin responded that if the victim's condition was as bad as Hodges said, then she needed to take the victim to the hospital. Hodges talked with the victim's mother about taking the victim to the hospital, and the appellant stated that if they did so "they're going to think [he] did it."

Hodges testified that she noticed the trash can by the victim's bed had been emptied and that she told the victim's mother that the diaper the appellant had changed was not there. The victim's mother left the room and returned with the diaper. Hodges said the victim's mother also had paper towels with blood "all over them." They opened the diaper but saw no blood in it. Hodges said that "mushy" stool was in the diaper but that the amount of stool "wasn't huge" and that she saw nothing concerning about the stool. She said the bloody paper towels were "kind of pink in some places . . . slimy, if you will" and appeared to have

bodily fluid on them. The State asked Hodges if she recognized the fluid, and she said that she thought it was semen. She said the nurses never used paper towels to clean the victim after a bowel movement. They always used baby wipes.

Hodges testified that she and the victim's mother decided to take the victim to the emergency room (ER) but did not let the appellant know what they were doing. They put the diaper that Hodges had taken off the victim, the diaper that the appellant had changed, and the bloody paper towels into a bag and put the bag in Hodges's purse. On the way to the hospital, Hodges and the victim's mother agreed to say the victim's condition occurred when Hodges "ran [the victim's mother] down to the Dollar General." Hodges said that when they arrived at the ER and spoke with the triage nurse, the victim's mother "was a completely different person" and told the nurse that the victim "had been dealing with some constipation problems and that there was a little blood in her feces." Hodges said that the victim's mother's statement was "[a]bsolutely not" consistent with what Hodges had seen but that Hodges did not say anything to the triage nurse. She said that the victim's mother "didn't let me do a whole lot of talking" but that "I did try to stress the severity of the rip." The victim's mother did not tell the nurse about the bloody paper towels or the blood in the diaper that the appellant had changed.

Hodges testified that her shift ended at 7:00 p.m. and that Martin arrived at the hospital to relieve her. Hodges spoke with Martin in the parking lot, "tried to stress to her the severity of the tears," and gave her the bag that contained the diapers and paper towels. Hodges said that when she got home, she telephoned the hospital, spoke with the nurse caring for the victim, and told the nurse that she thought "they should investigate further because [she] thought there was a little more going on that [the victim's] mother hadn't made them aware of." Hodges also began having second thoughts about lying to her supervisor regarding the amount of time she had been away from the victim that day. Hodges had told her supervisor that she and the victim's mother had gone to the store. Hodges said she did not tell her supervisor about the four-hour trip because she was afraid of losing her job and her nursing license. However, she decided "to come clean . . . for [the victim's] sake." The next morning, she went to CareAll and told her supervisor about the trip, and CareAll fired her. Hodges went to the sheriff's department and spoke with Investigator Kelly Carter.

On cross-examination, Hodges acknowledged that a laxative or fiber supplement was a routine part of the victim's care and that the victim had to have them. She also acknowledged that the victim's physician had prescribed Miralax or Benefiber to the victim and had switched the victim from one to the other. At the time of this incident, the physician had switched the victim back to Benefiber. The appellant had very little to do with the victim. In fact, neither of the victim's parents had much to do with her care because the nurses always took care of her. During the four-hour trip, Hodges and the victim's mother

-4-

stopped at the home of Hodges's boyfriend in Smithfield to get money for gas. When they returned to the victim's mother's home after the trip, Hodges saw blood in the victim's diaper. Defense counsel asked Hodges about the amount of blood, and she stated, "I mean it wasn't just like covered in blood but there was spots of blood, smears of blood."

Hodges acknowledged that as part of her duties, she made notes about the victim throughout her shifts. On November 22, 2011, Hodges made her notes after she left the ER. Defense counsel showed Hodges her notes, and she acknowledged that she wrote that blood "'appear[ed]'" to be in the victim's diaper. She said she was sure she saw blood. She acknowledged that a child could have a large bowel movement with blood in the stool. She described the tear to the victim's rectum as large and "straight up and down" but said, "I looked away from it to be completely honest because it startled me." The paper towels were not saturated with blood, but "there was a lot of smeared blood on them." The blood appeared to be mixed with semen but Hodges could not say for sure whether the fluid was semen or some other bodily fluid. Defense counsel asked why she thought the fluid was semen, and she stated, "I guess because she was torn and that's the first thing that entered my mind." She acknowledged that although she was scared for the victim on November 22, she did not show the diapers or paper towels to the hospital staff. She said that she regretted that decision every day and that she and the victim's mother thought the appellant had done something to the victim. Hodges acknowledged that the ER physician diagnosed the victim with constipation. Hodges said she thought the hospital staff "didn't check her out thoroughly because they weren't led in the right direction to check her out thoroughly." She acknowledged that she did not know the appellant harmed the victim.

On redirect examination, Hodges testified that what she saw in the diaper did not match the appellant's description in his text message. She acknowledged that, given the physician's diagnosis of constipation, she could have decided not to reveal anything to her CareAll supervisor. However, she stated,

> As a human being I felt like -- and also I have a daughter that is the same age and seeing [the victim] the way that I saw her in the condition that she's in it was horrifying and I truly felt like I had to go further with it for [the victim's] sake. Yes, I didn't feel that he went far enough as investigating what was wrong with her.

Tracy Martin testified that she became a licensed practical nurse in June 2005 and was involved in the victim's care through CareAll from June or July 2011 until November 22, 2011. The victim could not communicate, sit, or roll over but responded to loud noises. When the victim was in pain, she was fidgety, moved her arms, and sometimes produced

tears from her eyes. Martin spent at least thirty-six hours per week with the victim, usually working twelve-hour shifts, and her care of the victim included respiratory treatments, rotating splints on the victim's hands and feet, exercising, bathing, and administering medications. The victim's parents also knew how to care for the victim and changed the victim's trach tube, which the nurses were not authorized to do. The victim's mother was very active in her care and instructed the nurses. The appellant changed the victim's trach when it needed to be changed, but Martin did not see him often and did not have much interaction with him. Besides Martin and Sethly Hodges, other nurses also provided care for the victim.

Martin testified that on November 22, 2011, she was supposed to care for the victim from 7:00 p.m. to 1:00 a.m., which was a short shift. About 5:00 p.m., Hodges texted Martin that she was scared something had happened to the victim. Hodges later telephoned Martin and told her what was happening. Martin told Hodges to notify CareAll and take the victim to the ER if Hodges had any question about the victim's condition. Martin thought CareAll told Hodges to take the victim to the ER, and Martin reported to the ER for duty.

Martin testified that when she arrived at the hospital, the victim, the victim's mother, the appellant, and Hodges were sitting in the waiting room. The victim's mother asked Martin to drive the appellant to work, so Martin drove him to Calsonic. During the drive, the appellant asked Hodges if constipation could have caused the victim's "problems." He also told Martin to tell the victim's mother "that constipation causes that." Martin said she thought the appellant's statements were "very odd." When she returned to the ER, the victim and the victim's mother were still in the waiting room. Hodges and Martin went to get some things out of Hodges's car, and Hodges reported to Martin what had happened. While Hodges and Martin were outside, the victim's mother texted or telephoned Martin, asked what they were doing, and told Martin that she needed to get back inside. Martin took the victim's car seat out of Hodges's car, and Hodges gave her a white plastic bag containing diapers and paper towels. Hodges told Martin that the items in the bag were from the victim and that Martin needed to take them. Martin saw the paper towels and described them as "kind of pink-tinged like blood-body fluid mixture but it was dried." She said that the blood was smeared and that the bodily fluid looked like semen. Martin put the plastic bag in her car and returned to the ER. She did not open the diapers.

Martin testified that when she and the victim's mother met with the ER doctor, the victim's mother told him that they were there due to "[c]onstipation, a recent med change from Miralax to Benefiber and some blood in [the victim's] stool." All Martin knew was what Hodges had told her, but the victim's mother's statement to the doctor was inconsistent with Hodges's version. Martin said that constipation was "not a big concern" in her care of the victim and that "I don't recall ever seeing her have a really hard bowel movement."

However, Martin had seen the victim have difficulty passing formed stool. Martin had never seen blood in the victim's stool or anal fissures on the victim. The victim took Miralax and Benefiber for constipation and had been switched from one to the other. When the switch occurred, Martin did not notice any changes in the victim's bowel movements.

Martin testified that when the victim's mother took off the victim's diaper for the ER doctor, Martin saw "a very small amount of red, I'm assuming was blood and there was some brownish-yellowy spots on her diaper that looked almost like liquid stool and a little bit of slime." She said that the doctor looked at the victim's "bottom"as if he was changing her diaper, "holding the legs up just kind of glancing." He did not look closely at the victim's rectum. The victim also had an abdominal x-ray. The doctor told them that the victim had a small amount of stool in her upper intestinal tract and to continue with the victim's fiber regimen at home. After the victim was discharged from the hospital, Martin drove everyone home. The victim was exhausted, and Martin got her ready for bed. Meanwhile, the victim's mother changed the victim's bed linens because "[t]here was little droplets of blood in a few places and there was some smeared stool on the sheet and the body pillow." The victim was wearing only a shirt, and Martin changed her into her bed clothes. Martin said she thought the shirt was put into the laundry basket.

Martin testified that the white plastic bag containing the diapers and paper towels had been in the backseat of her car and that "I know that [the victim's mother] took them out of my vehicle but I don't know where they went past that." The next morning, Martin stopped by CareAll to turn in some paperwork. Hodges was there and "kind of distraught about everything that [had] happened." Hodges was upset because she thought nothing had been done about the situation and talked about going to the sheriff's department. Later that day, Martin met Hodges there, and they spoke with Investigator Kelly Carter.

On cross-examination, Martin testified that she did not work with the victim after November 22 because the victim's mother telephoned CareAll and asked that she not return. She said that when she and Hodges went outside at the hospital, Hodges first showed her the items in the white plastic bag and then explained what had happened. Hodges asked for Martin's opinion about the bodily fluid on the paper towels, and Martin thought the fluid was semen. Martin said she had seen semen previously and was basing her opinion on personal and professional experience. Hodges also thought the fluid was semen. Martin acknowledged that Hodges was concerned the appellant had perpetrated some act on the victim. Martin said she did not reveal Hodges's concern to the ER staff because she did not have any first-hand knowledge "other than seeing the paper towels." Also, Hodges had agreed to call the ER and "give them a report on what had happened under her watch." Martin was present when the ER doctor stated his findings, and Martin was concerned that the doctor's findings were not consistent with what had actually happened. Nevertheless,

Martin did not say anything to the doctor. The next day, Hodges and Martin met with Investigator Carter together but wrote their statements separately.

On redirect examination, Martin testified that she saw the victim's rectal area when the ER doctor raised the victim's legs and that "you could see a tear below her rectum maybe that size. You could see it running down from her rectum." Martin demonstrated the length of the tear for the jury and acknowledged that it was about one inch. She did not examine the victim's rectal area when they returned home on November 22. Martin said she changed the victim's diaper but "didn't go any further than rinsing her with water because she was obviously in pain."

Investigator Kelly Carter of the Warren County Sheriff's Department testified that he learned about the case on November 23, 2011, and spoke with Sethly Hodges and Tracy Martin. He acknowledged that they gave statements to him that were consistent with their trial testimony. Alicia Cantrell from the Department of Children's Services (DCS) was assigned to the case, and she and Investigator Carter went to the victim's home on the afternoon of November 23. The victim, the victim's parents, the victim's half-brother, and a home health nurse were there. The victim's mother took Investigator Carter and Cantrell into the victim's bedroom, and they viewed the victim.

Investigator Carter testified that he had learned from Hodges and Martin that the victim's light blue shirt and pink shorts were in a diaper bag hanging in the victim's closet and that a white spot was on the clothing. Investigator Carter asked the victim's mother for permission to search the home, and she consented. Investigator Carter said he found the clothes where the nurses had said and that he saw a white spot, "like a dropping," on the shorts. The victim's mother allowed him to take the clothing. That night, Investigator Carter learned that the victim and someone from DCS were at the hospital. Investigator Carter went there and spoke with the victim's mother. The appellant was not present. The victim's mother told Investigator Carter that she and the nurse had gone to the Dollar General Store the previous day and were away from the victim about forty-five minutes. Investigator Carter questioned the victim's mother about the time and then confronted her with Hodges's claim that they had been gone four hours. The victim's mother admitted to the time and said that the victim was left in the appellant's care. She told the officer that she had lied because she did not want to get Hodges in trouble.

Investigator Carter testified that on November 28, he returned to the victim's home and spoke with the victim's mother again. Investigator Carter had learned that a dark blue body pillow cover was folded in the bottom of the victim's hamper in her bedroom. He asked the victim's mother for consent to search, and she said yes. Investigator Carter found the pillow cover and collected it as evidence. On December 1, 2011, Investigator Carter

spoke with the appellant at the appellant's mother's home. He did not give <u>Miranda</u> warnings to the appellant because he had no reason to arrest the appellant and was "just basically going to talk to him to see what he knew about the incident." He wrote the appellant's statement, the appellant reviewed it, and the appellant signed it. In the statement, the appellant said the following: On November 22, 2011, the appellant stayed home with the victim and heard her "beeper monitor go off," so he went in her room to check on her. The victim had had a hard bowel movement. The appellant did not see anything wrong, and the bowel movement did not have blood on it. The appellant changed the victim's diaper and lay down on the floor in her room. He texted the victim's mother, telling her about the bowel movement and that the victim's "butt looked raw so I put cream on it." About twenty minutes before the victim's mother came home, the appellant changed another diaper that contained "some hard and some soft poop." He did not see blood in the diaper, put the diaper in the trash, and took out the trash. The appellant used paper towels instead of baby wipes to wipe the victim. He was lying on the floor when the victim's mother got home. The appellant told Hodges about what had happened and went to smoke. Hodges called the victim's mother into the victim's bedroom, and the victim's mother yelled at the appellant, "'[W]hat the [f***] did you do, Joe?'" The appellant did not tell her anything. The victim's mother said the victim was bleeding, so they all left for the hospital. Tracy Martin arrived at the hospital and drove the appellant to work.

Investigator Carter testified that after the appellant gave his statement, the appellant asked about the victim's clothes. Investigator Carter told the appellant that he had not yet sent the clothes to the Tennessee Bureau of Investigation (TBI). The appellant stated, "I sometimes masturbate." Investigator Carter asked if the appellant did so in the victim's room, and the appellant said no. The appellant said that he sometimes used his clothes to clean himself but that he did not use the victim's clothes. Investigator Carter wrote the appellant's masturbation statement in his notes but did not put it in the appellant's written statement. On February 6, 2012, Investigator Carter asked the appellant to provide a DNA sample. He collected buccal swabs from the appellant and the victim and sent all of the evidence to the TBI Crime Laboratory. Later, he learned that semen had been found on the victim's shorts. On April 20, 2012, Investigator Carter went to the appellant's home and asked him for an interview at the sheriff's department. The appellant did not have a ride, so he rode to the sheriff's department with Investigator Carter. Although the appellant was not under arrest, he received <u>Miranda</u> warnings and spoke with Investigator Carter and Investigator Jason Rowland. Investigator Carter said that Investigator Rowland "mainly" questioned the appellant. During the interview, which was recorded, the appellant stated that he never saw blood in the victim's diaper and that he wiped the victim with a paper towel because the perfumes in baby wipes could burn the victim. Investigator Carter questioned the appellant about the semen, and the appellant could not explain how the semen got onto the victim's shorts. Investigator Carter said the appellant stated that the semen should not

have been there and that he had not masturbated that day.

On cross-examination, Investigator Carter acknowledged that after speaking with Hodges and Martin on November 23, he was concerned about a sexual assault. He and Alicia Cantrell went to the victim's home to conduct a welfare check on her. The appellant answered the door, and Cantrell told him that they needed to speak with the victim's mother. Cantrell told the victim's mother that they were there for a welfare check on the victim. Cantrell also advised the victim's parents that she and Investigator Carter were there "looking into some allegations."

Investigator Carter testified that when he returned to the home on November 28, he had the victim's mother sign a consent to search form. He did not have her sign a consent to search form on November 23 when he collected the shirt and shorts. Investigator Carter said that throughout his investigation, the appellant was "[s]omewhat" cooperative and always maintained that he did not do anything to the victim. However, Investigator Carter said that the statements the appellant made after his written statement on December 1 "kind of raised my suspicions a lot more on him." Investigator Carter acknowledged that those statements were not part of the appellant's written statement. He also acknowledged that when he asked the appellant during the April 20 interview if the appellant had masturbated on November 22, the appellant may have said that he probably did. Investigator Carter knew when he and Investigator Rowland interviewed the appellant that semen had been found on the victim's shorts but did not know the semen belonged to the appellant. He denied leading the appellant to believe it was the appellant's semen, stating, "Investigator Rowland is the one who basically asked the questions." Investigator Carter acknowledged that the appellant continually stated that he did not know how the semen got on the victim's shorts.

Investigator Carter testified that at some point, DCS advised him that two doctors from the hospital ER had examined the victim on two separate occasions and that both had concluded the victim's rectal tear was the result of a hard bowel movement. He also received information about the case from the Our Kids Center and DCS reports. Investigator Carter did not interview the doctors or anyone from Our Kids and did not review any medical records. He denied that DCS, not the sheriff's department, "spearheaded" the case.

Dr. Laura Boos of the TBI Crime Laboratory's Serology DNA Unit testified that she received the victim's shirt and shorts, a blue pillowcase, and the appellant's and the victim's buccal swabs. She tested the clothing for semen and the pillowcase for blood and semen. Dr. Boos found semen on the victim's shorts and compared the DNA from the semen to the DNA from the buccal swabs. The DNA from the semen matched that of the appellant. She said that the probability of a person unrelated to the appellant having his same DNA profile exceeded the world's current population of almost six billion people. In other words, "one

would not expect to find that same profile from anyone else in the world statistically." On cross-examination, Dr. Boos testified that she could not determine how long the semen had been on the shorts or how it got there.

Lori Littrell, a physician's assistant at the Our Kids Center in Nashville, testified that she performed a forensic medical examination of the victim on November 23, 2011. The victim was well nourished but unresponsive during the exam, and Littrell noticed that the victim had some limb stiffness and spastic movements throughout the exam. Littrell looked at the victim's vaginal and rectal areas with a colposcope, which magnified the areas. Littrell said that the victim's vaginal exam was normal and that ninety-five percent of all vaginal exams conducted at the Our Kids Center were normal due to the delay in disclosure of abuse and the fact that some children were touched in ways that did not cause any type of physical injury. During the victim's rectal exam, Littrell noticed fissures, which she described as "really small . . . superficial cuts that are fairly common in the anal area." The victim's fissures initially appeared to be "pretty insignificant." However, when Littrell used her hands to separate the victim's "butt cheeks," she saw that the victim had two anal "tears." Littrell said that she considered a tear to be more extensive than a fissure. Looking at the victim's anal area like a clock, Littrell saw a "pretty extensive tear" at the 6:00 position. The victim also had a tear at the 11:00 position. The victim had fissures at the 3:00, 5:00, and 8:00 positions. Littrell identified photographs of the tears and fissures for the jury.

Littrell testified that fissures were common for a person with a history of constipation. However, the victim's tears were abnormal, and Littrell concluded that her findings were "more excessive or extensive than what would be expected with the passing of a large stool or constipation and thereby raised serious concerns about the possibility of sexual abuse." If Littrell had been in the ER with the victim on November 22 and 23, she would have disagreed with the ER doctors' diagnoses. She said that sperm on the victim's clothing and the victim's rectal bleeding made her even more concerned about sexual abuse. She said that in cases of constipation, a child would have blood in the stool or diaper at the time of the bowel movement.

On cross-examination, Littrell testified that Alicia Cantrell had referred the victim to the Our Kids Center and acknowledged that Cantrell had been concerned about a sexual assault. Littrell also acknowledged that the victim had been examined on two prior occasions, once on November 22 and once on November 23, and that the victim had been diagnosed with fissures caused by constipation. Cantrell sent the victim to Our Kids because she disagreed with those diagnoses. Littrell acknowledged that if the two ER physicians had conducted digital examinations of the victim's rectum, those exams could have exacerbated the victim's fissures. Littrell examined the victim "after hours" on November 23 but could not remember the exact time of the examination. Littrell said that Our Kids employees did

not diagnose children with sexual abuse; instead, "[w]e give our impressions as far as we're concerned about the possibility." Littrell said she was "very concerned [about] penetrating trauma" in the victim's case. She said she had examined 500 to 600 children and had "never seen a history of constipation with this type of injury." At the conclusion of Littrell's testimony, the State rested its case.

The victim's mother testified that she and the appellant "were together" four years and that the appellant was the victim's father. In November 2011, the victim received twenty-four-hour nursing care from four nurses who worked twelve-hour shifts. On November 22, the victim's mother and Sethly Hodges drove to Smyrna in order to pick up the victim's mother's son. The nurses were not supposed to leave the victim. However, the victim's mother had wrecked her car and asked Hodges to drive her to Smyrna. The victim's mother stated that while she and Hodges were on the trip, the appellant texted that the victim had had a large bowel movement, that he had changed the victim's diaper, and that he had put ointment on her "butt." The appellant also advised the victim's mother that she needed to give the victim more water to make sure the victim's stool was softer. After the victim's mother and Hodges left Smyrna, they went to a pharmacy to get pills for Hodges's boyfriend and took the pills to him.

The victim's mother testified that the appellant was asleep on the floor when she returned home and that she had to wake him. She said she was "chewing his butt" because he had forgotten to feed the victim. While they were outside arguing, Hodges began changing the victim's diaper. Hodges yelled for the victim's mother, and the victim's mother went into the victim's bedroom. Hodges showed the victim's mother a baby wipe and asked if blood was on the wipe. The victim's mother looked at the wipe and answered, "[L]ooks like it but could be poop." The victim's mother used another wipe to wipe the victim, saw a small amount of blood on the wipe, and began arguing with the appellant again. She got the diaper that the appellant had changed out of the trash, and they all went to the hospital. The victim's mother took the diaper to the hospital so she could show it to the doctor.

The victim's mother testified that when they arrived at the hospital, she did not take the bag containing the diaper inside because she did not want to carry a trash bag into the hospital. She told the ER staff that the victim was bleeding, that the victim's father had changed her diaper, and that the diaper "had a big poop in it." The ER doctor diagnosed the victim with anal fissures due to constipation. The victim's mother said she was not concerned about anything else because the hospital staff "didn't say anything otherwise." The next day, a DCS employee and a police investigator arrived at the family's home. They asked questions, asked to look through the home, and asked that the victim return to the hospital. The victim's mother took the victim back to the ER, and another ER doctor diagnosed the victim with anal fissures due to constipation. The victim's mother said that

she did not mislead the hospital staff on November 22 or 23 and that, during the visit on November 23, "I didn't hardly talk to the doctors at all. . . . They already knew we was coming because I guess Alicia [Cantrell] had already called them and told them we were going to be down there. I didn't have to explain anything to them."

The victim's mother testified that after they left the hospital on November 23, she took the victim to the Our Kids Center in Nashville. They arrived about 1:00 a.m. on November 24. After the appellant was arrested, Investigator Carter told the victim's mother that semen had been found on the victim's shorts. The victim's mother said she told the investigator that she was "bothered" by that revelation and that she "didn't think that it could happen."

On cross-examination, the victim's mother testified that the appellant did not spend much time with the victim and only took care of her when other people were not there to do it. The victim's mother thought the victim would be safe with the appellant on November 22. She and Hodges left for Smyrna about 12:45 p.m., and the appellant texted her about 2:00 p.m. The text did not mention blood. The victim's mother and Hodges returned home about 5:00 p.m. The victim's mother said that she had to wake the appellant and that he slept on the floor of the victim's room when he had to take care of the victim because "her alarm goes off and you have to go in there . . . so he would just stay in there with her." When the victim's mother went into the victim's room that afternoon, she did not smell anything. Hodges took off the victim's diaper, and the diaper was clean. The victim's mother said that she yelled at the appellant because a small amount of blood was on the baby wipe and the victim had been hurt in the appellant's care. She stated that the victim had problems with bowel movements and that she thought the appellant "might have like kept [the victim's] legs up to help her push hard bowels out." She said she told the appellant that if he had hurt the victim, she would kill him.

The victim's mother testified that Hodges pointed out that the appellant had emptied the trash can in the victim's room. The victim's mother said that the appellant usually did not take out the trash in the middle of the day and that the trash usually was emptied at the end of every nurses's shift. The victim's mother and the appellant retrieved two dirty diapers from the emptied trash. One of the diapers had stool in it, and the other had urine in it. The victim's mother and the appellant also retrieved two or three baby wipes and some paper towels out of the trash. Blood was on one of the baby wipes, and blood and stool were on the paper towels. The victim's mother said the appellant told her that the victim's "butt was raw and he didn't want to burn her butt using the baby wipes so he wiped with the paper towel." Hodges also pointed out to the victim's mother that red or brown stains were on the victim's pillowcase. The victim's mother did not see stains on the victim's shorts. The State asked the victim's mother if she had "spread [the victim] open" to look at the victim's rectum as Hodges had testified, and the victim's mother answered, "No. I [held] her legs up." She

-13-

denied telling anyone from law enforcement that she spread the victim's legs apart to inspect the victim's rectum.

The victim's mother acknowledged that when she took the victim to the ER on November 22, the victim was bleeding only slightly. However, she said, "I take her to the ER [any time anything] happens." She said she told the ER doctor that blood and "poop" were in the victim's diaper. When the State reminded the victim's mother that she had testified that no blood was in either diaper retrieved from the trash, she stated that blood was on one of the baby wipes and that the wipe was in the diaper containing stool. She acknowledged that she did not show the dirty diaper to the ER doctor but said that she told him about the diaper and that it was in the car if he wanted to see it. The ER doctor inserted his finger into the victim's rectum during the examination. When the victim's mother got home that night, she put the plastic bag containing the two dirty diapers and paper towels back into the trash. The next day, the appellant's father "took it off" before Alicia Cantrell and Investigator Carter arrived. The victim's mother said she lied about where she was on November 22 because she did not want Hodges to get in trouble. However, when Hodges told the truth about the trip, the victim's mother "looked like the idiot." She acknowledged that she had been involved with DCS previously and that Hodges did not have a reason to lie. The victim's mother stated that "[w]henever I fire a nurse they usually call DCS on me" and that she disliked how DCS "treat[ed] people." The victim's mother said that when Hodges did not show up for work as scheduled on November 23, she told the appellant that DCS would be "knocking on the door either today or tomorrow."

Dr. Nigel Fontenot testified that he was an ER physician at River Park Hospital and examined the victim on November 23, 2011. The victim had been examined by another doctor previously and returned to the ER for another determination as to whether she had physical signs of abuse, specifically anal trauma. Dr. Fontenot said he was aware prior to the exam about possible sexual abuse and examined the victim's vaginal and anal areas. For the anal exam, Dr. Fontenot pulled apart the folds of the victim's buttocks to look at the tissue in the anal opening. He said that he did not see any bruising or irritation to the tissue but saw a "tiny, tiny" fissure at the 6:00 position. He said the fissure was "maybe just a few millimeters in size." Dr. Fontenot did not see any active bleeding. He acknowledged that he had examined children for sexual abuse previously and said that he could not recall any case in which he had seen evidence of sodomy. He had seen, however, evidence of vaginal rape. He stated that in the instant case, he did not see "anything that stood out as signs that there was a forcible assault."

On cross-examination, Dr. Fontenot testified that he did not use a colposcope or external light source during the victim's rectal examination. He conducted an external, visual exam and saw one fissure. He did not conduct an internal exam. Therefore, he would not

-14-

have been surprised to learn that someone who conducted an internal exam saw an internal fissure. However, he would have been surprised to learn that someone who conducted an external exam saw more than one external fissure. He stated that an extremely handicapped child such as the victim, who was unable to resist a perpetrator, would experience less physical trauma during a sexual assault than a child capable of resisting and that he would expect to see "minimal external evidence of trauma." In fact, the passage of an extremely large, hard stool could cause more trauma to the child than a penile penetration. Dr. Fontenot had been advised that the victim had experienced an unusually large bowel movement, and he relied on that statement for his diagnosis. Therefore, in his opinion, it was reasonable to assume that the victim's fissure had been caused by constipation. He acknowledged that if he had known semen was present on the victim's clothing, he would have looked at the cause of the fissure differently.

At the conclusion of Dr. Fentenot's testimony, the jury convicted the appellant as charged of aggravated rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced him to fifty-eight years in confinement to be served at 100%.

## II. Analysis

### A. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress Lori Littrell's testimony and the Our Kids report because Alicia Cantrell improperly revealed to Our Kids employees that the appellant had a prior juvenile adjudication for a sex offense, which biased Littrell in her findings of the victim's exam. In support of his argument, the appellant notes that two physicians had found that the victim's anal fissures were caused by constipation while Littrell was concerned that the fissures were caused by penetration and that "[t]he only difference was she knew Defendant was a juvenile sex offender and the physicians did not." The State argues that the appellant has failed to show that he is entitled to relief. We agree with the State.

Before trial, the appellant filed a motion to suppress the testimony of Our Kids employees and the Our Kids report about the victim's case. In the motion, the appellant alleged that suppression was necessary because, according to the report, Alicia Cantrell from DCS had advised the Our Kids employees, prior to the victim's examination at Our Kids, that the appellant was "a juvenile sex offender and was in DCS custody and placed in a detention facility for several years." The appellant argued that Cantrell's disclosure about his juvenile adjudication violated Tennessee Code Annotated section 37-1-153 and DCS policy and procedure; that Cantrell disclosed the information "with the intent to influence the [Our Kids] findings in favor of criminal behavior, notwithstanding prior [medical] findings to the

contrary"; and that the only remedy was suppression of testimony by the Our Kids employees and the report. In support of his claim, the appellant stated that it would be impossible for him to cross-examine the employees about how their knowledge of his juvenile adjudication influenced their findings without revealing to the jury the highly prejudicial information. The appellant attached copies of Tennessee Code Annotated section 37-1-153 and DCS's Administrative Policies and Procedures 9.5, which was titled "Access and Release of Confidential Child-Specific Information," to his motion as exhibits.

During a hearing on the motion, defense counsel reiterated that if the trial court allowed Our Kids employees such as Lori Littrell to testify and allowed the Our Kids report to be introduced into evidence, he had no way to cross-examine the employees about the bias created by the improper disclosure without revealing to the jury that the appellant was a juvenile sex offender. The State argued that Cantrell had not violated Tennessee Code Annotated section 37-1-153 because she had not acquired the information about the appellant's juvenile adjudication from the juvenile court. The State also argued that Cantrell had not improperly disclosed the information to Our Kids because DCS policy "also indicates that they should notify facilities that are providing physicals to potential child victims about that information." The State proposed that the statement about the appellant's prior juvenile adjudication be redacted from the report. However, defense counsel maintained that redaction was not a sufficient remedy because "I can't effectively challenge their potential bias on that issue."

The trial court overruled the appellant's motion but ordered that the State redact the statement from the Our Kids report. The court advised defense counsel that

> I think you still have the right to make the argument that they
> didn't have anything more to go on than what the doctors told
> them but they accused him anyway and they can't bring up the
> fact that he was a prior sex offender and I think that works to
> your advantage.

Subsequently, the trial court filed a written order, noting that no proof of the appellant's juvenile adjudication had been "considered in arriving at Our Kid's diagnosis and treatment recommendations."

At trial, Lori Littrell testified about her findings during the victim's examination and that she was "very concerned [about] penetration" in this case.[1] The State did not question

---

[1]We note that the appellant did not object to Littrell's testimony. On appeal, the State argues that
(continued...)

-16-

Littrell about the Our Kids report or introduce it into evidence.

The appellant raised this issue again in his motion for new trial. At the hearing on the motion, defense counsel maintained that Cantrell had improperly disclosed the information and that

> [i]f we cannot have that entire [report] excluded from the trial in this case and if we cannot have suppressed the testimony from those individuals, we are left in a scenario where we either, one, sit silent as to that disclosure; or two, address it through cross-examination and delve into the possibility of bias by a particular witness after being given that information.

Defense counsel argued that redaction of the report "did not go far enough" and that he was denied his constitutional right to cross-examine Littrell effectively. The State argued that no proof had been offered to show how Cantrell obtained the information about the appellant's juvenile adjudication, "just as there was no proof offered as to whether or not that information had any impact on the nurse practitioner Lori Littrell's opinion." The trial court agreed with the State in that nothing indicated the Our Kids employees had been prejudiced by the information. The trial court stated, though, that "I don't know that that makes it totally okay because just because someone says they're not affected by something doesn't necessarily mean that that's true." Nevertheless, the court denied the appellant's motion for new trial.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in

_____

[1](...continued)
the appellant's failure to make a contemporaneous objection has resulted in a waiver of the issue and that we can only address it for plain error. However, the appellant raised the issue in the motion to suppress and the trial court denied the motion. The appellant was not required to raise the issue again in order to preserve it for appeal.

evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). Denial of a defendant's right to effective cross-examination is "constitutional error of the first magnitude" and may violate the defendant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). Additionally, the right to cross-examine a witness for bias is a fundamental right. State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).

Turning to the instant case, the initial basis for the appellant's argument is that Cantrell obtained the information about his juvenile adjudication in violation of Tennessee Code Annotated section 37-1-153, which provides that juvenile court records are to remain confidential except under certain limited circumstances, and that her disclosing the information to Our Kids violated DCS's own policies and procedures. However, the appellant did not call Cantrell as a witness at the suppression hearing to question her about the circumstances in which she obtained the information or whether the information she disclosed to Our Kids violated DCS's confidentiality rules.

Furthermore, even assuming that Cantrell obtained and revealed the information improperly, the appellant also failed to call Littrell as a witness at the suppression hearing. Thus, he made no offer of proof regarding Littrell's possible bias or prejudice. We note that in addressing this issue at the motion for new trial hearing, the trial court recognized that "just because someone says they're not affected by something doesn't necessarily mean that that's true." In our view, the trial court's statement indicates that, had the appellant questioned Littrell about her possible bias at the suppression hearing, the court would have carefully considered Littrell's credibility regarding any denial that her findings were not influenced by her knowledge of the appellant's juvenile adjudication. Therefore, while we can appreciate the appellant's Confrontation Clause argument, we agree with the State that he is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because, without the Our Kids report and Littrell's testimony, the State's proof would have

consisted only of his statement, the two medical evaluations diagnosing anal fissures caused by constipation, the conflicting testimony of the witnesses, and the spot of semen on the victim's shorts. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Aggravated rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less." Tenn. Code Ann. § 39-13-531(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Turning to the instant case, we initially note that the State did not introduce the redacted Our Kids report into evidence. Moreover, we determined in the previous section

that the appellant failed to show that the trial court erred by denying his motion to suppress Littrell's testimony. Therefore, taken in the light most favorable to the State, the evidence shows that the appellant was left alone with the victim for four hours on November 22, 2011. When the victim's mother and nurse, Sethly Hodges, returned home, they discovered that the victim was bleeding from her rectum. The victim's mother looked inside the victim's rectum and was so disturbed by what she saw that she immediately yelled at the appellant and asked what he had done to the victim. Hodges said the victim's rectum had been "ripped," and she described the injury as "shocking" and "gut wrenching." The victim's mother retrieved the two diapers that the appellant had changed and the paper towels that he had used the clean the victim. The appellant had claimed in a text message that one of the diapers contained hard stool. However, when the victim's mother and Hodges looked in the diaper, the diaper contained soft stool. The paper towels were soiled with blood and what Hodges thought was semen. Based on the victim's condition, her mother and Hodges decided to take her to the ER where a doctor concluded that the victim was suffering from constipation. However, Hodges testified that the victim's mother had misled the triage nurse, and Martin testified that the victim's mother had misled the ER doctor. Although the victim's mother testified that the doctor inserted his finger into the victim's rectum, Martin said that the doctor did not do a thorough exam and only glanced at the victim's bottom. The next day, a second ER doctor also examined the victim. At trial, the doctor testified that he only performed an external exam. Littrell testified that she examined the victim's anal area with a colposcope and saw two tears, as opposed to mere fissures, at the 6:00 and 11:00 positions. Littrell identified photographs of the victim's rectum showing the tears and stated that she was concerned about anal penetration. She also stated that the victim's injuries were too extensive to have been caused by constipation. Finally, the appellant's semen was on the victim's shorts, and the appellant could not explain to Investigator Carter how his semen got there. The jury heard the conflicting evidence and chose to accredit the testimony of the State's witnesses. Therefore, the evidence is sufficient to support the conviction.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE